IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

BRUCE FULLER,

     Appellant,

 v.                                                                          Case No.  5D16-2646

STATE OF FLORIDA,

     Appellee.

_____/

Opinion filed September 28, 2018

Appeal from the Circuit Court
for Orange County,
Alan S. Apte, Judge.

William R. Ponall, of Ponall Law, Maitland,
for Appellant.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Rebecca Roark Wall,
Assistant Attorney General, Daytona
Beach, for Appellee.


EDWARDS, J.

     Bruce Fuller appeals his judgment and sentence for manslaughter with a firearm.

We hold that Fuller is entitled to a new trial because of the independent and cumulative

effects of several rulings that permitted the State to introduce unfairly prejudicial evidence.

Although we agree that the trial court gave an inappropriate Stand Your Ground jury

instruction, we find that did not constitute fundamental error because the instruction was

given at defense counsel's request.[1]  Additionally, we hold that Fuller is entitled to a new Stand Your Ground pretrial immunity hearing where the State will bear the burden of proof in accordance with section 776.032(4), Florida Statutes (2017), which should be applied retrospectively in this pending case.  Accordingly, we reverse and remand with instructions to the trial court regarding further proceedings. Because we are reversing and remanding for a new trial, we need not address the remaining issues raised by Fuller.

## I.  BACKGROUND INFORMATION

Fuller was charged with the first-degree murder of Furrukh Shan Alam, whom he admittedly shot with Alam's pistol in Fuller's home on the morning of August 10, 2011. Fuller claimed that he shot Alam in self-defense during a struggle with Alam.  The State also charged Fuller with sexual battery of a helpless person, S.G., based upon allegations that Fuller molested her at his home during the night of August 9, or the early morning of August 10, 2011, while she was incapacitated due to her voluntary alcohol and drug use. The sexual battery charge was severed for a separate trial.

### A.  Pretrial Stand Your Ground Immunity Hearing

Fuller moved to dismiss the murder charge, claiming that he was immune from prosecution under section 776.032, Florida Statutes (2011), a part of the Stand Your Ground law.  Because that statute as originally enacted did not provide procedural guidance, the supreme court in *Dennis v. State*, 51 So. 3d 456 (Fla. 2010), "approved the procedure of a pretrial evidentiary hearing . . . for evaluating a claim of immunity under the Stand Your Ground law." *Bretherick v. State*, 170 So. 3d 766, 768 (Fla. 2015).  Five years later, in *Bretherick*, the supreme court adopted "the procedure that has been

---

[1] Neither Fuller's nor the State's appellate counsel was trial counsel.

followed by all of the district courts of appeal after *Dennis*," which placed "the burden of proof on the defendant to prove entitlement to immunity from prosecution by a preponderance of the evidence at a pretrial hearing." *Id.* at 771. Fuller's Stand Your Ground hearing took place on March 1, 2016, in accordance with the procedure adopted in *Bretherick*.

At this hearing, Fuller testified that while working as a travel and real estate agent in 2001, he met Alam, who was one of his clients on a group cruise. They continued their acquaintance by occasional phone calls and visits. According to Fuller, in 2004, Alam left a pistol at Fuller's home because he could not take it with him while traveling. Several days before the shooting, Alam called Fuller from Jacksonville and then spent a long weekend at Fuller's house in Maitland. Alam was acting his "normal jovial self" over the weekend while they went to dinner and shopped together and during a party on Saturday night at Fuller's house when Alam met some of Fuller's friends.

Fuller said that on Tuesday night, Alam began to make "bizarre" negative comments. Meanwhile, S.G., a woman Fuller had dated, came to his house for dinner. Both Fuller and S.G. had several glasses of wine before they each took an Ambien and went to bed. Fuller testified that he and S.G. engaged in intimate mutual touching.

Early the next morning, Fuller awoke to the sound of Alam and an unknown man speaking angrily in an unrecognized foreign language. Fuller testified that Alam ignored him as Fuller tried to find out who the stranger was and what was going on. Fuller claimed that the way Alam and the stranger were acting concerned him, and made him feel threatened, uncomfortable, nervous, and unsafe. Neither man actually made threatening gestures or comments to Fuller.

3

Fuller noticed Alam's pistol in the home office where Fuller claimed they had put it on Tuesday afternoon after Alam had told Fuller he wanted his gun back. Fuller said that he felt uncomfortable having the gun out in the open Wednesday morning while Alam and the stranger were arguing. Fuller said he emptied the clip's cartridges onto a chair, then took the pistol and empty clip to Alam's room and placed it on Alam's suitcase. At some point that morning, Alam told Fuller that the stranger had left the house, but then followed and mocked Fuller as he searched the house to see if the stranger was really gone. Alam wound up in the garage alone with Fuller. A little later, S.G. walked through the garage, where Fuller and Alam still were, to go to work.

Fuller testified that Alam became agitated, gesturing, pacing, speaking in a foreign language, and displaying completely unusual personality traits. Fuller told Alam this was scaring him and that he was going to call the police. According to Fuller, Alam prevented him from calling the police, blocked his access to a telephone, and interfered when one of Fuller's business associates called, because Fuller asked her to call the police.

Fuller testified that Alam made aggressive moves towards him. As Alam backed Fuller into a corner, Alam grabbed his gun and pointed it at Fuller, which led to a struggle for the pistol. Fuller testified that he wrestled the gun away and hit Alam in the head with it because Alam was blocking his exit. As they wrestled for control of the gun again, Fuller said, it fired, hitting Alam, who fell to the ground. Fuller then called 911. At the Stand Your Ground hearing, Fuller said that he was neither drunk nor under the influence of alcohol or drugs when he went to bed or woke up. Fuller denied consuming any drugs other than the one Ambien pill before bed. On cross-examination, Fuller testified that

4

Alam's pistol had been in its case until two days before the shooting, when they took it out and put it in Fuller's home office.

The trial court denied Fuller's Stand Your Ground motion and request for immunity, specifically finding that Fuller had failed to meet his burden of proof.

### B. Trial

Prior to and during trial, Fuller objected to and moved to exclude any evidence relating to the previously severed sexual battery prosecution in which S.G. was the alleged victim. The State agreed that it would not refer to any of the sexual conduct or events as "sexual battery." However, the State argued that it needed to admit testimony about Fuller's sexual activity with S.G. on the night before, or early morning of, the shooting to explain how her DNA came to be found on both the gun and its case.

The trial court overruled Fuller's objections and permitted the State to elicit testimony from S.G. that she had three or four glasses of wine and felt too woozy to drive. She took an Ambien provided by Fuller. S.G. said she went to sleep in Fuller's bed alone while he went back out into the house. She testified that she was asleep in less than ten minutes; the next thing she knew it was morning; she awoke to a distant noise like a garage door opening, and heard voices. S.G. said that as she left for work that morning, she saw Fuller and Alam in the garage. The two men stopped whatever discussion they were having when she approached. She noticed that Fuller had a perturbed or annoyed look on his face. In response to the prosecutor's questions, S.G. testified she did not engage in any sexual conduct with Fuller that night.

S.G. related that months after the shooting, the police requested her to provide DNA samples, a request she did not understand. S.G. testified that she later received a

5

text message from Fuller in which he said, "It's been bothering me, I had my fingers in you. Your DNA was on my hands. I don't mean to be bold but it's true. I'm so sorry."

Forensic testimony was presented by the State to the effect that S.G.'s DNA was found on the gun case and on the gun itself, which would be consistent with what the State's witnesses referred to as a wet transfer via Fuller's fingers following the conduct described in that text message. The State argued that this evidence eliminated S.G. as the suspected shooter despite her DNA being on the gun and its case. The lead detective testified that Fuller had not mentioned anything to him about a woman spending the night before the shooting at his house until the woman's DNA was discovered on the gun and its case.

Fuller also moved to prevent and objected to the State introducing testimony and photographs concerning (1) drug paraphernalia, empty liquor bottles, and cocktail glasses found in the house after the shooting; (2) both recent and older text messages involving Fuller that could be interpreted as discussing the purchase of illegal drugs; and (3) testimony from S.G. that on a different occasion at Fuller's house, she saw Fuller and two women with visible evidence of cocaine use coming out of his bathroom. Fuller claimed that the drug-related evidence was irrelevant and unduly prejudicial, while the State successfully argued that the drug-related evidence was inextricably intertwined and necessary to give context to the other events. The State said this would also explain the presence of cocaine metabolites in Alam's blood. Fuller's objections were overruled and all the drug-related evidence was placed before the jury.

The State presented testimony that Fuller cooperated in providing fingerprint and DNA samples to the police. Over Fuller's objections, the State presented a recorded

police station conversation in which Fuller was asked for, but declined to provide, a blood sample for drug and alcohol analysis. The police officer asked if Fuller would be willing to permit a blood draw in order to rule out intoxication, but Fuller declined. The police then asked again if he wanted to give a blood draw and Fuller again declined. The trial court denied Fuller's objections, motion for reconsideration, and motion for mistrial concerning this evidence.

The State introduced a recorded jailhouse phone call that Fuller made, in which he repeatedly disparaged the prosecutor. The trial court overruled Fuller's timely objections to those portions he claimed were irrelevant and inflammatory, such as where he referred to the prosecutor as unethical, corrupt, a liar, evil, throwing sucker punches, and called the State's case "a bunch of bullshit."

Following both sides' closing arguments and instructions from the court, the jury returned a verdict finding Fuller guilty of the lesser-included offense of manslaughter with a firearm rather than first-degree murder. At the sentencing hearing, initially in response to a motion for downward departure, the trial court inquired if Fuller wanted to offer anything by way of contrition or mitigation; the defense advised of their reluctance to make any statements because of the still-pending sexual battery charges. After the trial court found no basis for downward departure, Fuller gave a very brief statement to the effect that he was sorry Alam had passed away. The trial court then sentenced him to twenty years in the Department of Corrections with credit for time served.

## II. EVIDENTIARY ISSUES

Fuller is entitled to a new trial because of several evidentiary rulings made during trial. We will address each in turn.

7

## A. Evidence that Fuller Declined to Submit to Voluntary Blood Draw

Fuller argues that he was denied a fair trial because, over his objection, the State was permitted to introduce evidence that he refused to voluntarily provide a blood sample that police would have tested for alcohol and drugs. "[A] trial court's ruling on the admission of evidence is reviewed for abuse of discretion." *Fike v. State*, 4 So. 3d 734, 737 (Fla. 5th DCA 2009) (citing *LaMarca v. State*, 785 So. 2d 1209, 1212 (Fla. 2001)).

At trial, Fuller moved to exclude the recorded conversation he had with police at their headquarters on the morning of the shooting regarding Fuller's refusal to submit to a blood draw. Police testimony had described Fuller's speech as slurred and his eyes as bloodshot when they arrived at the crime scene. The trial court denied the motion, his motion for mistrial, and a motion for reconsideration.

The State introduced the conversation, which included the following exchange:

> [Officer:] That's easy. And, Bruce, like we talked about, you've been great. You've consented to all the swabs and the fingerprints and all that. Would you be willing, just to rule out that you were intoxicated, giving a blood draw?
>
> [Fuller:] No.
>
> [Officer:] You don't want to give me a blood draw?
>
> [Fuller:] No.
>
> [Officer:] Okay. But you're saying you're not impaired?
>
> [Fuller:] I said I drank wine.
>
> [Officer:] No. But you said that you're not impaired, you didn't drink in excess?
>
> [Fuller:] Right.
>
> [Officer:] Okay.

8

Fuller argues that a defendant's refusal to submit to pre-arrest investigative testing offered by law enforcement is not relevant and admissible at trial where, as here, the defendant is not advised of any possible adverse consequences flowing from the refusal and is given the impression that the test is optional. The State contends that Fuller's refusal to submit to the blood draw was admissible as evidence of his consciousness of guilt as it was an attempt to conceal the evidence of his drug and alcohol use in order to evade or impede his prosecution.

In *Menna v. State*, 846 So. 2d 502 (Fla. 2003), the Florida Supreme Court approved a trial court's exclusion of evidence related to the defendant's refusal to submit to a gunshot residue test. *Id.* at 508. In that case, the defendant's "husband was shot outside of his office and taken to a hospital where he was pronounced dead." *Id.* at 502. The defendant wife was questioned at the hospital by police and asked "to voluntarily submit to a hand swab examination for gunpowder residue." *Id.* at 503. The defendant was told the test "was noninvasive and would only take a few minutes." *Id.* She was not told "whether the test was mandatory or permissive," nor was she informed "that her refusal to take the test could be used against her in court." *Id.* At trial, the court granted the defendant's motion to preclude the State "from referring to or presenting evidence of her refusal to submit" to the gunshot residue test. *Id.* The State petitioned this Court for a writ of certiorari, which was granted.

In its opinion quashing this Court's decision in *State v. Menna*, 793 So. 2d 1029 (Fla. 5th DCA 2001), and approving the trial court's exclusion of the evidence, the Florida Supreme Court noted two exemplary cases with "discrete facts" leading to "different

9

results as to whether [a] defendant's refusal to submit to a gunshot residue test was probative of the defendant's consciousness of guilt." *Menna*, 846 So. 2d at 504.

In *State v. Esperti*, 220 So. 2d 416 (Fla. 2d DCA 1969), the defendant refused to submit to a gunshot residue test, which investigators informed him was compulsory, by "sitting on his hands, wiping his hands, and rubbing tobacco ashes on his hands after learning that cigarette ashes could be confused with gunpowder." *Menna*, 846 So. 2d at 504 (citing *Esperti*, 220 So. 2d at 417). Holding that the "acts and conduct of the defendant" were "susceptible of no prima facie evidence except consciousness of guilt," the Second District found the evidence "relevant and certainly material." *Id.* (quoting *Esperti*, 220 So. 2d at 418) (emphasis removed).

In *Herring v. State*, 501 So. 2d 19 (Fla. 3d DCA 1986), on the other hand, the defendant likewise refused to submit to a gunshot residue test, but "was not told that he was required to take the test, or that his refusal could be used against him." *Menna*, 846 So. 2d at 504 (citing *Herring*, 501 So. 2d at 20). At trial "the prosecutor argued to the jury that the testimony 'was convincing proof of the defendant's consciousness of his guilt.'" *Id.* (quoting *Herring*, 501 So. 2d at 20). The Third District held that the admission of the evidence was error, reasoning:

> The failure to communicate to Herring that the test was compulsory carried with it, we think, the implicit suggestion that the test was permissive and that he thus had a right to refuse. Consequently, even if the refusal had some arguable probative value, its admission would be unfair where the police may have led the defendant to believe that he had a right to refuse.

*Id.* at 505 (quoting *Herring*, 501 So. 2d at 21). In its opinion in *Menna*, the Florida Supreme Court deemed the Third District's reasoning in *Herring* "sound" and quoted it with approval:

10

> A defendant's behavior is circumstantial evidence probative of his consciousness of his guilt, and ultimately guilt itself, only when it can be said that the behavior is "susceptible of no prima facie explanation except consciousness of guilt." *State v. Esperti*, 220 So. 2d 416, 418 (Fla. 2d DCA), *cert. dismissed*, 225 So. 2d 910 (Fla. 1969).
>
> . . . .
>
> The unfairness, of course, is that a defendant who is told he may refuse and is told of no consequences which would attach to his refusal may quite plausibly refuse so as to disengage himself from further interaction with the police or simply decide not to volunteer to do anything he is not compelled to do. In contrast, if a defendant knows that his refusal carries with it adverse consequences, the hypothesis that the refusal was an innocent act is far less plausible.

*Id.* (quoting *Herring*, 501 So. 2d at 20–21).

In *Menna*, the Florida Supreme Court found the defendant's refusal to submit to a gunshot residue test which investigator's suggested was voluntary rendered the facts of that case "closer to those presented in *Herring* than those involved in *Esperti*." *Id.* at 506. The Florida Supreme Court then adopted the reasoning from *Herring*:

> [B]efore such refusal evidence can be introduced the court must make a prima facie determination that the evidence is relevant with regard to the defendant's consciousness of guilt. This requirement implicitly recognizes that, as articulated by Judge Pearson in *Herring*, there are potentially many reasons, other than guilt, that a defendant might be motivated to refuse to submit to such a test. Furthermore, under some circumstances, such as those in *Herring*, a refusal may be so ambiguous as to remove from its invocation any probative value in the refusal as to the issue of the defendant's alleged consciousness of guilt. We find no error in the trial court's determination that this was an appropriate conclusion here.
>
> As in *Herring*, although Menna was informed that the test would be brief and was noninvasive, she was not told of any adverse consequences of her refusal to take the test and was given the impression that the test was optional. Although a defendant's refusal to permit police to conduct a test may be admissible where the police have informed the defendant that

11

> the law requires compliance, "[w]here . . . the authorities fail to tell the defendant that compliance is required and that noncompliance may have adverse consequences, a refusal to comply may be of dubious relevance." 2 Clifford S. Fishman, *Jones on Evidence*, § 13:14, at 498 (7th ed. 1994).

*Id.* at 506–07 (footnotes omitted).

Like the defendants in *Menna* and in *Herring*, Fuller was not told that the requested blood draw was compulsory, nor was he informed of adverse consequences should he refuse. Thus, we conclude that it was clearly an abuse of discretion to admit that evidence.

Whether the error is harmless, as the State contends, is a closer question. Once an appellant has demonstrated error, the burden falls on the State to prove "beyond a reasonable doubt that the error complained of did not contribute to the verdict." *State v. DiGuilio*, 491 So. 2d 1129, 1135 (Fla. 1986).

The State introduced the refusal evidence with the reasonable expectation that the jury might speculate that Fuller "knew" if he provided a blood sample, the test results would have disproved Fuller's claim that on the morning of the shooting he was not drunk or under the influence from the wine he admittedly consumed the night before. Further, the jury may have speculated that Fuller was concerned the test results may have shown not that Fuller had consumed only one Ambien, as he claimed, but instead that he had participated in using cocaine or other illegal drugs, as the State repeatedly suggested. Thus, given those assumptions, the State anticipated that the jury would consider Fuller's refusing to submit a blood sample to show consciousness of guilt. In any event, the potential test results would not have been directly probative of whether Fuller committed first-degree murder, but had they been favorable to the State, Fuller's credibility would

12

have been impaired, which could have been crucial in determining whether the jury would believe his story of self-defense.

The State did not dwell on Fuller's blood draw refusal during the presentation of evidence or in closing. However, it was part of the State's larger alcohol and drug-based attack on Fuller's credibility and character, which included both old and recent drug-related text messages, photographs of drug paraphernalia, photographs of liquor bottles and glasses, the testimony of S.G. that weeks before the shooting she saw Fuller and two women in his house, implying they had cocaine residue on their faces, and his alleged sexual battery of S.G. after plying her with wine and drugs. While we must look at each evidentiary objection sequentially, we are not compelled to consider each in a vacuum. Thus, we find that, when considered in combination with other improperly admitted evidence, permitting evidence and argument regarding Fuller's refusal to submit to a voluntary blood draw was reversible error.

## B. Evidence of Sexual Battery

At trial, the State presented evidence that scientific testing identified S.G.'s DNA on the gun involved in the shooting as well as on the gun's case. It was permissible for the State to present evidence that Fuller had intimate sexual contact with S.G., specifically that he placed his fingers in her vagina the night before the shooting, because that evidence was relevant to explain how her DNA was transferred by Fuller to the gun and its case. Evidence explaining the DNA transfer sequence was also relevant to eliminate S.G. as possibly being the shooter. It was also relevant to refute Fuller's claim that the gun case and gun had been retrieved a day or two earlier, as S.G.'s DNA was not

transferred to his fingers until the night before the shooting, thereby creating doubt as to Fuller's account of events leading up to the shooting.

What was impermissible and unfairly prejudicial was the State's insistence on presenting evidence, over repeated defense objections, that Fuller's intimate sexual contact with S.G. was done without her knowledge and while she was physically helpless as a result of voluntarily consuming wine and an Ambien provided by Fuller. That evidence suggested that Fuller had committed a sexual battery on S.G.; however, that should not have been an issue in this trial because the sexual battery charge had been severed for a separate trial. Nor did the evidence suggesting Fuller sexually battered S.G. contribute to explaining how and when her DNA was transferred to the gun and its case. Contrary to the State's argument, evidence suggesting that the sexual contact was non-consensual was not necessary or helpful to establish the context in which the shooting occurred. Rather, it was irrelevant evidence that Fuller committed a collateral crime and was offered to impugn Fuller's character. "Collateral-crime evidence is not admissible when it is relevant only to prove bad character or propensity." *Crosby v. State*, 222 So. 3d 629, 631–32 (Fla. 5th DCA 2017). "Evidence that suggests a defendant has committed other crimes or bad acts can have a powerful effect at trial." *Id.* at 632 (quoting *McCall v. State*, 941 So. 2d 1280, 1283 (Fla. 4th DCA 2006)). "The admission of improper collateral crime evidence is presumed harmful error because of the danger that a jury will take the bad character or propensity to crime thus demonstrated as evidence of guilt of the crime charged." *Id.* (internal citations and quotations omitted). The trial court abused its discretion by overruling Fuller's objections to the evidence of sexual battery. The State has not overcome the presumption that its admission was harmful error. Because this

14

evidence presumptively deprived Fuller of a fair trial, we reverse and remand for a new trial.

### C. Evidence of Prior Drug Use

Fuller argues that the trial court abused its discretion by allowing the State to introduce evidence suggestive of Fuller's use of drugs long before the date of the shooting. The State introduced text messages between Fuller and an individual identified as Matt G that dated back months, even years before the date of the shooting. Although the text messages seemed to use code words or terms (e.g., "redwood," "cornflakes") in place of referring by name to a drug or quantity of drugs (e.g., "need two full units"), the State contended, reasonably, that these text messages referred to the purchase and use of illegal drugs by Fuller. To the extent that old text messages identified Matt G as an individual from whom Fuller obtained illegal drugs, that evidence was relevant and admissible, as it gave context to messages sent by Fuller in the days before the shooting in which he attempted to secure drugs because Fuller had a friend (Alam) coming into town from California. That evidence, as well as the photographs of the crime scene, stand in stark contrast to Fuller's version of the events leading up to the shooting. To the extent that the older text messages were not required to establish that theory or were cumulative, the evidence was either irrelevant or its probative value was outweighed by the unfair prejudice to Fuller, as it merely established his historical use of drugs. *See* § 90.403, Fla. Stat. (2017).

Additionally, the State elicited testimony from S.G. that approximately one month prior to the shooting, she was at Fuller's house for a party. Over objection, S.G. was permitted to testify that at that time, she saw Fuller and two women come out of his

15

bathroom with "evidence of cocaine use."[2]  There was absolutely no relevant connection between this testimony and the shooting.  This evidence did nothing to help paint "an accurate picture of the events surrounding the crime."  *See Victorino v. State*, 23 So. 3d 87, 99 (Fla. 2009).

The trial court abused its discretion by overruling Fuller's objections and permitting the introduction of this outdated collateral crime evidence, as it was "relevant only to prove bad character or propensity."  *Crosby*, 222 So. 3d at 631–32.  The State has not overcome the presumption of harmful error that accompanies the introduction of such inadmissible collateral crime evidence.  *Id.* at 632.  This error added to the cumulative prejudicial effect of the other improperly admitted evidence; thus, Fuller is entitled to a new trial at which this evidence should not be admitted.

On the other hand, we do not find that the trial court abused its discretion by allowing evidence that suggested the use of illegal drugs at Fuller's house during the days leading up to the shooting.  Fuller objected to police photographs depicting and testimony describing drugs and drug paraphernalia (marijuana, white powder, cut straws, rolled up currency, scales used to weigh drugs, containers that are often used to transport cocaine, etc.) that the police found at Fuller's house on the morning of the shooting.  That evidence, along with photographs of liquor bottles and cocktail glasses, was relevant to establish that contrary to Fuller's testimony, a party had taken place during the night after S.G. went to sleep, which could have led to Fuller being "perturbed" by Alam, as S.G. testified he

---

[2] Fuller requested a sidebar conference which was denied, and when he advised that he had a motion to make, the court told him to "have a seat."  Thus, the issue was preserved for our review.

16

appeared to be on the morning of the shooting. Accordingly, this evidence may be admissible at retrial, if a proper foundation is laid.

### D. Error to Admit Portion of Jail Call Where Fuller Disparaged Prosecutor

Fuller correctly asserts that the trial court abused its discretion when it allowed, over defense counsel's objections, the State to introduce in evidence portions of Fuller's jail phone calls in which he bemoaned the prosecutor's tactics, referring to them as "sucker punches," asked how the prosecutors could "sleep at night," complained of how the State treated witnesses—"made Bonnie seem like a liar," "made Craig seem like a liar"—and called the prosecutor's case "a bunch of bullshit." He also claimed that the "prosecutor was lying," referred to the State's "sneaky bullshit lies," and accused the prosecutor of "boldface [lying] to the judge" "on many occasions." He called the prosecutor "unethical" and "corrupt" and said he felt better because he had "brought [the prosecutor's] evil side out" so that "everybody in the courtroom" would "agree that he was evil and a liar." Absolutely none of that was relevant to the charged crime nor did it shed any light on Fuller's credibility, as the State argues. Instead, it seems to be another example of the State inappropriately attacking Fuller's character before the jury. This abuse of discretion was unfairly prejudicial to Fuller. *See Cramer v. State*, 191 So. 3d 991, 993 (Fla. 4th DCA 2016). Although in this case, the erroneous admission of the disparaging jail call does not independently rise to the level of reversible error, it is one more component of the overall cumulative error to be considered in this case.

17

## III. JURY INSTRUCTIONS IMPROPERLY SUGGESTED DUTY TO RETREAT IF FULLER ENGAGED IN UNLAWFUL ACTIVITY

On appeal, Fuller argues that one of the jury instructions regarding self-defense included erroneous statements regarding his duty to retreat prior to using deadly force, which conflicted with another proper jury instruction. The complained of jury instruction was based on section 776.013, and read:

> If the defendant was not engaged in an unlawful activity and was attacked in any place where he had a right to be, he has no duty to retreat and had the right to stand his ground and meet force with force, including deadly force, if he reasonably believed that it was necessary to prevent great bodily harm to himself or to prevent the commission of a forcible felony.

Given the evidence presented at trial, it was error to give the above jury instruction which included a duty to retreat if the defendant was engaged in an unlawful activity as the circumstances involved in the shooting fell under section 776.012 rather than 776.013. *See Miles v. State*, 162 So. 3d 169, 171–72 (Fla. 5th DCA 2015); *Little v. State*, 111 So. 3d 214, 221 (Fla. 2d DCA 2013). Under many circumstances, giving this erroneous jury instruction would require reversal because the faulty instruction may have led the jury in this case to conclude "that [Fuller]'s use of deadly force was inappropriate because he was engaged in unlawful activity [i.e., possession and perhaps use of illegal drugs] and therefore had a duty to retreat." *Eady v. State*, 229 So. 3d 434, 438 (Fla. 2d DCA 2017). However, here, the error was that of defense counsel who specifically requested this instruction even after the trial court repeatedly and plainly expressed the opinion that this instruction did not apply. The concept of fundamental error does not operate where defense counsel not only fails to object to an instruction, but affirmatively requests the trial court give the instruction which is later complained about on appeal. *Universal Ins.*

*Co. of N. Am. V. Warfel*, 82 So. 3d 47, 65 (Fla. 2012); *Lane v. State*, 168 So. 3d 1276, 1276 (Fla. 5th DCA 2015) ("Instructional error, if any, even if fundamental, was waived when Appellant requested the now challenged instruction."). Likewise, the possible confusion caused by giving conflicting instructions concerning whether Fuller had a duty to retreat was due to defense trial counsel's specific request for and failure to object to the improper self-defense jury instructions. Because the jury instruction errors were not preserved by objection and any error was invited by defense counsel's specific requests, we will not review this issue for fundamental error. If there is a retrial, only appropriate jury instructions should be requested and given.

## IV. CUMULATIVE EFFECT OF ERRORS AS ADDITIONAL BASIS FOR NEW TRIAL

We have discussed several errors that we found to be individually so unfairly prejudicial as to call for a new trial. We also discussed other errors that we found to be unfairly prejudicial, but which individually would not necessarily have justified granting a new trial. While each claim of error and its impact must be individually considered, when we consider the cumulative effect of the multiple errors, we conclude that Fuller was denied "the fair and impartial trial that is the inalienable right of all litigants in this state and this nation." *See Delhall v. State*, 95 So. 3d 134, 166 (Fla. 2012) (citing *McDuffie v. State*, 970 So. 2d 312, 328 (Fla. 2007)). Accordingly, for the reasons discussed above, we reverse the judgment and sentence previously entered in this case and remand to the trial court for further proceedings.

## V. RETROSPECTIVE APPLICATION OF REVISED STAND YOUR GROUND LAW

### A. Evolution of Stand Your Ground Legislation

19

In order to analyze Fuller's claim that he is entitled to a new pretrial Stand Your Ground immunity hearing where the State would bear the burden of proof, we must determine whether the amended 2017 version of the statute should be applied retrospectively in this case.[3] We acknowledge that our analysis is not being done in a vacuum, as the other four district courts of appeal have already considered this issue, resulting in evenly divided outcomes.[4]

A little history is in order. The Stand Your Ground statute, section 776.032, was passed in 2005, but at first "there was no prescribed procedure that a trial court should employ when a defendant claimed immunity under the statute." *Martin v. State*, 43 Fla. L. Weekly D1016, D1016 n.1 (Fla. 2d DCA May 4, 2018). The Florida Supreme Court addressed the procedure in two opinions:

> First, in *Dennis v. State*, 51 So. 3d 456, 463 (Fla. 2010), the supreme court held that immunity under section 776.032 should be determined at a pretrial evidentiary hearing. Then, in *Bretherick v. State*, 170 So. 3d 766, 779 (Fla. 2015), the supreme court clarified that the defendant bears the burden of proving entitlement to immunity by a preponderance of the evidence.

*Id.* On June 9, 2017, the governor of Florida signed into law an amendment to section 776.032 that added subsection (4), which legislatively altered the judicially-determined quantum and burden of proof:

---

[3] The words "retroactively" and "retrospectively" are used synonymously in the different cases analyzing this issue.

[4] Allowing retrospective application: *Martin v. State*, 43 Fla. L. Weekly D1016 (Fla. 2d DCA May 4, 2018), and *Commander v. State*, 246 So. 3d 1303 (Fla. 1st DCA 2018). Not allowing retrospective application: *Love v. State*, 247 So. 3d 609 (Fla. 3d DCA 2018), *review granted*, No. SC18-747, 2018 WL 3147946 (Fla. June 26, 2018), and *Hight v. State*, 43 Fla. L. Weekly D1800 (Fla. 4th DCA Aug. 8, 2018).

(4) In a criminal prosecution, once a prima facie claim of self-defense immunity from criminal prosecution has been raised by the defendant at a pretrial immunity hearing, the burden of proof by clear and convincing evidence is on the party seeking to overcome the immunity from criminal prosecution provided in subsection (1).

*Id.* at D1016; Ch. 2017-72, § 1, Laws of Fla. The bill specified that the act would "take effect upon becoming a law." Ch. 2017-72, § 1, Laws of Fla.

## B. Because of Its Procedural Nature, the Amendment Applies Retrospectively

In large part, whether an amended or newly enacted statute will be given retrospective application is determined by whether it is substantive or procedural in nature. Generally speaking, "[i]n the absence of clear legislative intent, a law affecting substantive rights is presumed to apply prospectively only while procedural or remedial statutes are presumed to operate retrospectively." *Basel v. McFarland & Sons, Inc.*, 815 So. 2d 687, 692 (Fla. 5th DCA 2002). "The rule for procedural/remedial [statutory] changes, in contrast to the presumption against retroactive application for substantive changes is as follows":

> *Remedial* statutes or statutes relating to remedies or modes of *procedure* which do not create new or take away vested rights, but only operate in furtherance of the remedy or confirmation of rights already existing, do not come within the legal conception or a retrospective law, or the general rule against retrospective operation of statutes.

*Smiley v. State*, 966 So. 2d 330, 334 (Fla. 2007) (quoting *City of Lakeland v. Catinella*, 129 So. 2d 133, 136 (Fla. 1961)). "[W]henever possible, [procedural or remedial] legislation should be applied to pending cases." *Id.* (quoting *Arrow Air, Inc. v. Walsh*, 645 So. 2d 422, 424 (Fla. 1994)). "Pending cases" include those that are currently on appeal, such as this one. *See Martin v. State*, 43 Fla. L. Weekly at D1018.

21

In *Alamo Rent-A-Car, Inc. v. Mancusi*, the Florida Supreme Court explained that "substantive law prescribes duties and rights and procedural law concerns the means and methods to apply and enforce those duties and rights." 632 So. 2d 1352, 1358 (Fla. 1994). "In the context of criminal cases specifically, 'substantive law is that which declares what acts are crimes and prescribes the punishment therefor, while procedural law is that which provides or regulates the steps by which one who violates a criminal statute is punished.'" *Martin v. State*, 43 Fla. L. Weekly at D1017 (quoting *State v. Garcia*, 229 So. 2d 236, 238 (Fla. 1969)).

In *Smiley*, the supreme court observed that the original Stand Your Ground statute created a new right of self-defense, permitting the use of deadly force with no duty to retreat under specified circumstances; that right did not exist previously outside one's home. *Smiley*, 966 So. 2d at 335. The supreme court found that "section 776.013 *created* a new affirmative defense for situations in which one may use deadly force without first retreating." *Id.* For those reasons, the supreme court concluded that the original Stand Your Ground statute was "a substantive change in the statutory law." *Id.* at 336.[5]

Unlike the original 2005 legislation, the 2017 revision to the Stand Your Ground law did not create any new right of self-defense or immunity from prosecution; it only dealt with two procedural matters. First, the revised statute designated which party would have the burden of proof at the pretrial immunity hearing, overriding supreme court case law

_____

[5] Fuller's alleged exercise of the right to self-defense, using deadly force without the duty to retreat in his own home, known as the "castle doctrine," predates the enactment of the original Stand Your Ground statute. However, before enactment of the original Stand Your Ground statute, this was treated as an affirmative defense to be presented at trial. Treating this also as an immunity from prosecution was a creation of the original Stand Your Ground legislation.

on that point. In *Shaps v. Provident Life & Accident Insurance Co.*, the Florida Supreme Court announced that "generally in Florida the burden of proof is a procedural issue," as "[t]he burden of proof concerns the means and methods to apply and enforce duties and rights." 826 So. 2d 250, 254 (Fla. 2002). In *Kenz v. Miami-Dade County*, 116 So. 3d 461 (Fla. 3d DCA 2013), the court considered a statutory change that shifted the burden of proving actual or constructive knowledge of a dangerous transient condition to the plaintiff in a slip and fall case; the old statute specifically stated that the plaintiff did not need to prove that element. Relying upon *Shaps*, the Third District concluded in *Kenz* that the statutory change to the plaintiff's burden of proof was procedural rather than substantive, and was therefore to be applied retroactively. *Id.* at 464–66; *see also City of Clermont v. Rumph*, 450 So. 2d 573, 575 (Fla 1st DCA 1984) (finding change in employee's burden of proof to be procedural and subject to retroactive application).

Second, the revised statute declared that the quantum or standard of proof at the pretrial immunity hearing would be by "clear and convincing evidence" rather than the judicially-adopted "preponderance of the evidence" quantum of proof. § 776.032(4). In *Stuart L. Stein, P.A. v. Miller Industries, Inc.*, 564 So. 2d 539 (Fla. 4th DCA 1990), the Fourth District found that a statutory amendment that "elevated the standard of proof to the 'clear and convincing' level" was procedural rather than substantive, and was to be applied retrospectively. *Id.* at 540. It also announced its agreement with the Second District's opinion in *Ziccardi v. Strother*, 570 So. 2d 1319 (Fla. 2d DCA 1990). *Id.*

It is clear that Florida law considers the burden of proof and the quantum or standard of proof as procedural matters, as both concern only the means and methods for enforcing already existing rights. If there was any lingering doubt about whether the

23

burden and quantum of proof were substantive or procedural, one only has to consider the supreme court's repeated pronouncements in *Bretherick*, which preceded and some argue was the catalyst for the 2017 legislative revision that added subsection (4) to section 776.032. "In *Dennis v. State*, we approved the **procedure** of a pretrial evidentiary hearing." *Bretherick*, 170 So. 3d at 768 (emphasis added) (internal citations omitted). "We consider whether placing the burden of proof on the defendant to prove entitlement to immunity from prosecution by a preponderance of the evidence at a pretrial hearing— the **procedure** that has been followed by all of the district courts of appeal after *Dennis*— is both appropriate and consistent with the statutory scheme." *Id.* at 771 (emphasis added). "These courts [the highest courts of Colorado, Georgia, and South Carolina] have adopted a **procedure** in which the defendant bears the burden of proof, by a preponderance of the evidence at a pretrial evidentiary hearing." *Id.* at 775 (emphasis added). The supreme court noted its agreement with Judge Gross of the Fourth District that "the **procedure** set forth in [Florida Rules of Criminal Procedure] rule 3.190(b) is well-suited for motions to dismiss based on statutory immunity that requires the defendant, who is seeking immunity, to bear the burden of proof by a preponderance of the evidence." *Id.* at 776 (emphasis added).

In concluding that the 2017 revision was procedural, we note our agreement with the decision of the Second District, in *Martin v. State*, 43 Fla. L. Weekly D1016, and our disagreement with the Third and Fourth Districts' decisions on this issue. In *Love v. State*, 247 So. 3d 609 (Fla. 3d DCA 2018), the Third District concluded that shifting the burden of proof from the defendant to the State is a substantive amendment, relying on *Smiley v. State. Id.* at 612. However, *Love* makes no mention of *Shaps*, in which the supreme

24

court squarely addressed and confirmed the general rule in Florida that statutory modification of the burden of proof is procedural, not substantive. *See Shaps,* 826 So. 2d at 254. Likewise, the Fourth District in *Hight v. State*, 43 Fla. L. Weekly D1800 (Fla. 4th DCA Aug. 8, 2018), concluded that the 2017 revision was substantive because it changed the burden of proof. *Id.* at D1802. As in *Love*, there is no mention in *Hight* of the supreme court's opinion in *Shaps.* In a more recent Stand Your Ground case, *Langel v. State*, 43 Fla. L. Weekly D2058 (Fla. 4th DCA Sept. 5, 2018), the Fourth District does mention *Shaps* in a footnote. *Id.* at D2059 n.1. *Langel* acknowledges that the supreme court "recognized that 'generally in Florida the burden of proof is a procedural issue.'" *Id.* (quoting *Shaps*, 826 So. 2d at 254). Nevertheless, the Fourth District refused to apply the general rule specifically stated in *Shaps*, and previously set forth in other similar cases relied upon in *Martin*, because they were civil, rather than criminal matters. *Id.* The Fourth District noted it had found no such pronouncements regarding the procedural nature of the burden of proof in any criminal case. However, the *Langel* court was likewise apparently unable to find any Florida-based authority for its refusal to follow *Shaps* or for the Fourth District's finding that unspecified differences between civil and criminal cases prevent application of *Shaps* in criminal cases.

Applying binding supreme court authority, we find that the 2017 revision of section 776.032—adding subsection (4), which effectively shifts the burden of proof from the defendant to the State and increases the quantum or standard of proof from a preponderance of the evidence to proof by clear and convincing evidence, is procedural and is not substantive, and is to be applied retrospectively in pending cases.

## C. Retrospective Application and Effective Date of Legislation

In *Hight*, the Fourth District took into account the effective date of the revised Stand Your Ground law when deciding that it should not be applied retrospectively. 43 Fla. L. Weekly at D1802. That court noted that "[i]n amending the statute, the legislature stated that '[t]his law shall take effect upon becoming a law,' which occurred when the governor signed the bill into law on June 6, 2017." *Id.* The Fourth District pointed to the supreme court's observation in *Devon* that "the Legislature's inclusion of an effective date for an amendment is considered to be evidence rebutting intent for retroactive application of a law." *Fla. Ins. Guar. Ass'n v. Devon Neighborhood Ass'n*, 67 So. 3d 187, 196 (Fla. 2011). However, because the Fourth District in *Hight* concluded that the amendment was substantive, it did not discuss additional important portions of *Devon* which clarify that one actually looks for a clear legislative intent regarding retrospection only with regard to substantive statutes:

> The rule that statutes are not to be construed retrospectively, unless such construction was plainly intended by the Legislature applies with peculiar force to those statutes the retrospective operation of which would impair or destroy vested rights. We further explained the general rule in *Laforet*, where we stated that "a **substantive** statute will not operate retrospectively absent a clear legislative intent to the contrary, but . . . a **procedural** or remedial statute is to operate retrospectively.

*Devon*, 67 So. 3d at 194 (emphasis added) (internal citations omitted). In *Devon*, the supreme court specifically found the amended statute it was reviewing "was clearly substantive." *Id.* at 195. "Therefore, the presumption against retroactive application of the substantive amendments to section 627.7015 applies in this case." *Id.* Only after determining that the amendment was substantive and presumptively not to be applied

26

retroactively did the supreme court search for any clear expression of legislative intent that the substantive amendment should be applied retroactively. *Id.* at 195–96. Thus, the two-prong test discussed in *Devon* is to be employed only with substantive amendments, which means that it will be applied only after the court determines that the amendment is substantive, rather than procedural.[6] *See also Fla. Hosp. Waterman, Inc. v. Buster*, 984 So. 2d 478, 496 (Fla. 2008) (first determine if the amendment is procedural or substantive, then determine whether presumption against applying substantive amendments retroactively is overcome by clear legislative intent for retroactive application). It bears stating again: procedural statutes are presumed to be retrospectively applicable. *See Smiley*, 966 So. 2d at 334.

Because the 2017 amendment was procedural, the two-prong test does not apply. Thus, there is no reason to search for "legislative intent" in the form of the effective date of the legislation. In other words, the effective date of procedural legislation is irrelevant to any consideration of its retrospective application. If this were not the case, there would be no explanation for the wealth of cases applying procedural laws retroactively without ever discussing the existence of effective dates.[7]

---

[6] The two-prong test for retroactive application of substantive amendments looks first for clear legislative intent for retroactive application. Only if such intent is found does the second prong comes into play: a consideration of whether it would be constitutional to apply the substantive amendment retroactively. *Devon*, 67 So. 3d at 194.

[7] *See, e.g.*, *Shenfeld v. State*, 44 So. 3d 96, 101–02 (Fla. 2010) (holding that a statutory amendment relating to probation tolling was procedural and therefore applied retroactively, without discussing the fact that the statute had an effective date); *Waterman*, 984 So. 2d at 494 ("[R]ight of access granted pursuant to the amendment is retroactive and therefore applies to adverse medical incident records existing prior to its effective date of November 2, 2004."); *Peeples v. Pilcher*, 423 So. 2d 907, 908 (Fla. 1982) (holding that a statutory amendment entitling real estate agents to a hearing prior to revocation of license was procedural and applied retroactively, without discussing fact

### D. Florida Constitution's Savings Clause

Both the Third District in *Love* and the Fourth District in *Hight* concluded that retrospective application of the 2017 amendment would run afoul of article X, section 9 of the Florida Constitution, which states: "Repeal or amendment of a criminal statute shall not affect prosecution or punishment for any such crime previously committed." That section is sometimes referred to as a "savings clause" because it permits prosecution or imposition of punishment for violation of criminal statutes in effect at the time an act was committed even if the statute is subsequently repealed or amended. The State argues that this savings clause would bar retrospective application of the 2017 revision to the Stand Your Ground statute. Applying this provision literally, it would be easy to make the argument that shifting the burden of proof from the defendant to the State and increasing the quantum of proof to "clear and convincing evidence" could "affect the prosecution" of prior criminal conduct. If the burden and quantum of proof had no effect on the prosecution, then the particulars of their application would not be so heavily litigated. However, we are prevented by *stare decisis* from applying article X, section 9 of the Florida Constitution so literally.

The Florida Supreme Court has repeatedly held that this constitutional provision, (using similar language previously embodied in Section 32, article 3, Constitution of 1885,

---

that statute had effective date); *Clarkson v. State*, 678 So. 2d 486, 486 (Fla. 5th DCA 1996) (holding that a statute removing obligation of trial court to make findings of fact was procedural and applied retroactively, without discussing fact that statute had effective date); *Grayson v. State*, 671 So. 2d 855, 855 (Fla. 4th DCA 1996) (same); *Thomas v. State*, 662 So. 2d 1334, 1336 (Fla. 1st DCA 1995) (same); *Kenz*, 116 So. 3d at 463–66 (holding that a procedural amendment altering the burden of proof in "slip and fall" cases applied retroactively to actions accruing before the statute's effective date, without discussing the effective date).

now article X, section 9, Florida Constitution 1968 Revision) is intended to prevent retroactive application of statutes that "relate[] to the offense itself, or the punishment thereof, and not to the remedy or procedure which the legislature may enact for the prosecution and punishment of offense, unless the change in the remedy should affect in some way the substantial rights of defense." *Mathis v. State*, 12 So. 681, 687 (Fla. 1893). "[P]rocedural changes in criminal law may escape the reach of article X, section 9." *Smiley*, 927 So. 2d at 1003. *See also Grice v. State*, 967 So. 2d 957, 960 (Fla. 1st DCA 2007) ("Florida courts have repeatedly held that [article X, section 9] applies only to statutes that effect a substantive change in the law; it has no application to changes in the law that are merely procedural or remedial."). Thus, because we have concluded that the 2017 amendment to the Stand Your Ground statute is procedural, we hold that its retrospective application to this case is not prohibited by article X, section 9 of the Florida Constitution. In reaching this conclusion, we note our agreement on this point with *Martin*, and our disagreement with the Fourth District in *Hight* and the Third District in *Love*, whose analysis was no doubt based upon their previous conclusions that the 2017 legislative amendment was substantive rather than procedural.

### E. Fuller is Entitled to a New Pretrial Immunity Hearing

In *Bretherick v. State*, this Court noted that "the issue of who bears the burden of proof may well be significant where the case is an extremely close one, or where only limited evidence is presented for the trial court's consideration." 135 So. 3d 337, 341 (Fla. 5th DCA 2013), *aff'd,* 170 So. 3d 756 (Fla. 2015). The Second District stated in *Martin* that the burden of proof "is an aspect of procedure that carries a profound influence over the tenor, tone, and tactics in a legal proceeding." *Martin*, 43 Fla. L. Weekly at

D1017.  We hold that Fuller is entitled to a new Stand Your Ground immunity hearing where the State would bear the burden of proof with the quantum of proof required being clear and convincing evidence.

## CONCLUSION

For the reasons set forth above, we hold that Fuller is entitled to a new pretrial Stand Your Ground immunity hearing to be conducted in accordance with the procedure set forth in section 776.032(4).  If Fuller is not found entitled to immunity from prosecution following that hearing, a new trial shall be conducted.

We certify that on the issue of retrospective application of section 776.032(4), our decision in this case expressly and directly conflicts with the decision of the Third District in *Love v. State*, 247 So. 3d 609 (Fla. 3d DCA 2018), *review granted*, No. SC18-747, 2018 WL 3147946 (Fla. June 26, 2018), and the decisions of the Fourth District in *Hight v. State,* 43 Fla. L. Weekly D1800 (Fla. 4th DCA Aug. 8, 2018), and *Langel v. State*, 43 Fla. L. Weekly D2058 (Fla. 4th DCA Sept. 5, 2018).

REVERSED AND REMANDED.  CONFLICT CERTIFIED.

COHEN, C.J. and PLEUS, R. J., Jr., Senior Judge, concur.